UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DONALD EAST,<br><br>Plaintiff,<br><br>vs.<br><br>SECRETARY OF CORRECTIONS KELLIE WASKO, INDIVIDUAL AND OFFICIAL CAPACITY; FORMER WARDEN BRENT FLUKE, INDIVIDUAL CAPACITY; UNIT MANAGER DANIEL SESTAK, INDIVIDUAL AND OFFICIAL CAPACITY; SEX OFFENDER MANAGEMENT PROGRAM JEFF NEIL, INDIVIDUAL AND OFFICIAL CAPACITY; ALEX REYES, ACTING WARDEN, OFFICIAL CAPACITY; JOHN DOE 1, INDIVIDUAL AND OFFICIAL CAPACITY; OTHER UNKNOWN PERSONS AND ENTITIES, INDIVIDUAL AND OFFICIAL CAPACITIES; AND SEX OFFENDER MANAGEMENT PROGRAM THOMAS GILCHRIST, INDIVIDUAL AND OFFICIAL CAPACITY,<br><br>Defendants. | 4:22-CV-04126-RAL<br><br><br>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Plaintiff Donald East, an inmate at Mike Durfee State Prison (MDSP) in Springfield, South Dakota, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Doc. 1; Doc. 10. He alleges that Defendants violated his First Amendment rights by retaliating against him for engaging in First Amendment protected conduct, his Eighth Amendment rights by being deliberately indifferent to the risk of sexual assault and unsafe housing conditions, his Fourteenth Amendment right to equal protection by treating him differently than other inmates who do not file lawsuits

and grievances, and his Fourteenth Amendment Due Process rights. Defendants move for summary judgment. Doc. 28. East opposes Defendants' motion for summary judgment. Docs. 45, 46, 47. For the reasons explained herein, this Court grants Defendants' motion for summary judgment.

## I.    Procedural History and Remaining Claims

Six claims in East's complaint and amended complaint survived screening. See generally Docs. 5, 9. Defendants move for summary judgment on all surviving claims. Doc. 28. East's responsive filings do not limit his arguments to the claims that survived screening. Rather, he discusses all the claims and allegations set forth in his complaint and amended complaint and makes no attempt to explain how the dismissed claims somehow support the claims that remain pending. Because of the number of claims and defendants, this Court begins with a summary of East's pending claims:

- East brings a First Amendment retaliation claim. He alleges his Minnesota Sex Offender Screening Tool Revised (MnSOST) score was changed, resulting in a change in classification status, in retaliation for engaging in protected conduct.

- East brings an Eighth Amendment claim against former MDSP Warden Brent Fluke and Secretary of Corrections Kellie Wasko for deliberate indifference to the risk of sexual assault at MDSP.

- East brings an Eighth Amendment claim against Unit Manager Daniel Sestak for deliberate indifference to unsafe housing conditions because Sestak ignored concerns regarding unsafe bunkmates and allowed dangerous inmates from other units to travel through East's unit without punishment.

2

- East brings an Eighth Amendment claim against Fluke and Wasko for deliberate indifference to unsafe housing conditions for failing to move the Admission and Orientation (A&O) unit to its own building.

- East brings a procedural due process claim alleging that South Dakota Department of Corrections (SDDOC) policy (1.3.E.2) providing that inmates have thirty (30) days to initiate the administrative remedy process following a classification or status decision violates due process because SDDOC policy does not require staff members to notify an inmate of a classification change or status decision.

- East brings an equal protection claim alleging differential treatment based on exercising First Amendment rights.

Because East's complaint and amended complaint[1] are verified, he contends they are "the equivalent of an affidavit" and are "sworn testimony that his allegations occurred." Doc. 46 at 4. East is correct that "the facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion." Roberson v. Hayti Police Dep't, 241 F.3d 992, 995 (8th Cir. 2001). But this Court need not accept as true each and every paragraph of East's verified pleadings or his affidavit, Doc. 47. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4). East's affidavit is replete with inadmissible hearsay recounting what East claims unidentified correctional officers or other inmates have said. See, e.g., Doc. 47 ¶¶ 11, 12, 21, 24, 32. His affidavit does not establish that he has firsthand knowledge or foundation to support

---

[1] In opposition to Defendants' motion for summary judgment, East cites to his proposed amended complaint, Doc. 7-1. This Court will cite to the amended complaint, Doc. 10, filed after East's motion to amend was granted.

many of his purported factual allegations. See, e.g., id. ¶¶ 9, 10, 48. East offers speculatory, conclusory averments setting forth his opinion regarding Defendants' motive behind certain actions. See, e.g., id. ¶¶ 21, 30, 37, 59. When considering whether East has demonstrated there is a genuine issue of material fact, this Court will not consider the paragraphs of East's verified pleadings, Docs. 1, 10, and affidavit, Doc. 47, that do not satisfy Rule 56(c)(4).

## II.    Facts[2]

### A.    The Parties

Plaintiff Donald East is in the custody of the SDDOC and at all relevant times has been incarcerated at MDSP. Doc. 36 ¶ 1; Doc. 45 ¶ 1. Defendant Kellie Wasko has been the South Dakota Secretary of Corrections since March 2022. Doc. 35 ¶ 1; Doc. 36 ¶ 2: Doc. 45 ¶ 2. Defendant Brent Fluke currently serves as the SDDOC's Deputy Director of Prisons, but he was the Warden at MDSP from June 2018 until November 2023. Doc. 30 ¶ 1; Doc. 36 ¶ 3; Doc. 45 ¶ 3. Defendant Daniel Sestak is a Unit Manager at MDSP. Doc. 34 ¶ 1; Doc. 36 ¶ 4; Doc. 45 ¶ 4. Defendant Jeff Neill has been employed by the SDDOC as a Sex Offender Management Program (SOMP) Case Manager in Sioux Falls since February 2016. Doc. 33 ¶ 1: Doc. 36 ¶ 5; Doc. 45 ¶ 5. Defendant Thomas Gilchrist has been employed as an SOMP Case Manager since July 2018, but he has been employed by the SDDOC since 1987. Doc. 31 ¶ 1; Doc. 36 ¶ 6; Doc. 45 ¶ 6.

### B.    MnSOST Score

Inmates in the custody of the SDDOC are classified as outlined in SDDOC Policy 1.5.B.01. Doc. 36 ¶ 31; Doc. 45 ¶ 31. When an inmate enters custody of the SDDOC, the inmate is initially

---

[2] This Court takes the facts primarily from those portions of Defendants' statement of material facts East does not dispute, but for the portions East properly disputes, this Court cites to both parties' versions and is mindful that genuine disputes of material fact are resolved at this summary judgment stage in East's favor.

placed in the A&O Unit for various assessments to facilitate assignment to an appropriate long-term housing location. Doc. 33 ¶ 4. Because of the nature of East's conviction, the MnSOST is one of the assessments that should have been completed in 2014 when he entered into the custody of the SDDOC, but due to an unknown oversight, that did not happen. Doc. 33 ¶ 5; Doc. 36 ¶ 34. MnSOST is one of the assessments the SDDOC utilizes to assist in determining an inmate's System Risk Level. Doc. 36 ¶ 33; Doc. 45 ¶ 33.

On January 7, 2021, East sent a kite to SOMP indicating he had some questions. Doc. 36 ¶ 35; Doc. 45 ¶ 35. Gilchrist responded to East's kite and requested that East put his questions in writing. Doc. 36 ¶ 35; Doc. 45 ¶ 35. East complied and sent a kite to Gilchrist on January 19, 2021, asking to know his static and MnSOST scores. Doc. 36 ¶ 36; Doc. 45 ¶ 36. Gilchrist attempted to look up the scores in the electronic inmate record system, COMS (Comprehensive Offender Management System), but no scores were listed. Doc. 36 ¶ 37; Doc. 45 ¶ 37. Gilchrist informed Neill that East did not have an MnSOST score recorded in COMS. Doc. 36 ¶ 38. In January 2021, Neill calculated East's MnSOST score by reviewing information from East's presentence investigation and pre-sentence psychosexual exam. Doc. 33 ¶¶ 6, 11. When completing an MnSOST assessment, SOMP personnel do not consult, question, or meet with inmates. Id. ¶ 10. East's MnSOST score was determined to be a Level R, the highest risk level possible. Id. ¶¶ 7, 11; Doc. 36 ¶ 40. After completing the MnSOST assessment, Neill entered the result in COMS.[3] Doc. 33 ¶ 11. The MnSOST scoring system did not change between 2014 and

---

[3] East contends that multiple officers "informed [him] that Fluke had requested to be notified on any updates to [his] COMS." Doc. 47 ¶ 12. East provides no other information regarding these alleged statements, including the identity of the officers or the dates on which the alleged conversations occurred. Any alleged out-of-court statements by these unidentified officers reporting what Fluke had said to them are inadmissible hearsay, which Rule 56(c)(4) precludes this Court from considering.

2021. Id. ¶ 9. If East's MnSOST's score had been calculated in 2014 on admission, it would have been an "R." Id. ¶ 12. SOMP Program Manager Brenna Carlson and Clinical Director Dr. David Kauffman verified Neill's calculation of East's MnSOST score. Doc. 36 ¶ 41.

Fluke is not involved in assigning or scoring inmates utilizing the MnSOST assessment; that assessment is completed by employees within the SOMP. Id. ¶ 48. Fluke does not have the authority or necessary expertise to change an inmate's MnSOST score. Id. ¶ 49; Doc. 45 ¶ 49. Sometime in late 2020, East asserts that Fluke told him that he "would 'pay' for suing him (referring to East v. Dooley, [4:19-cv-4126-RAL,] 2020 WL 5816248 (D.S.D. Sept. 30, 2020)) and he went on to tell [him] you didn't just report being raped you stated it in a public lawsuit." Doc. 47 ¶ 8. Approximately a year later, East contends that Fluke talked to him privately again and asked if he "had learned [his] lesson in regards to filing lawsuits against him and reporting sexual abuse in a public forum . . . . Fluke told [him] that he and another person had contacted Neill to give [him] an MnSOST score that would eventually result in loss of EDCs." Id. ¶ 13. Fluke denies telling Neill, Gilchrist, or anyone else to give East a certain MnSOST assessment score. Doc. 30 ¶ 15. Neill avers that no one requested that he give East any particular score when he completed the MnSOST assessment in January 2021. Doc. 33 ¶ 17. Gilchrist avers that "[n]o one contacted [him] asking or telling [him] to give East a certain score on his MnSOST or to ask anyone else to give East a certain score on his MnSOST." Doc. 31 ¶ 10. According to Gilchrist, he did not ask Neill or anyone else to give East a certain score on the January 2021 MnSOST assessment. Id. ¶ 13.

On November 2, 2021, East sent a kite to Gilchrist stating that he had just found out that there was a change to his MnSOST score on September 22, 2021, and he wanted to understand why there had been a change. Doc. 36 ¶ 45; Doc. 29-15; Doc. 45 ¶ 45. Gilchrist responded and

stated that East's MnSOST score was not changed on September 22, 2021, and was still a level R. Doc. 36 ¶ 46; Doc. 45 ¶ 46. On November 3, 2021, East sent another kite asking Gilchrist whether he had been able to gain access to East's chart or 2013 psychosexual exam. Doc. 29-16; Doc. 36 ¶ 47; Doc. 45 ¶ 47. Gilchrist responded in the negative and said that he would not do so until 2026 when East is eligible for programming. Doc. 29-17; Doc. 29-38; Doc. 36 ¶ 47; Doc. 45 ¶ 47.

System Risk Level for inmates is governed by SDDOC Policy 1.4.G.6. Doc. 29-5; Doc. 36 ¶ 51; Doc. 45 ¶ 51. A system risk designation is given to all inmates after evaluating objective criteria to identify inmates that may represent a high risk of violence towards others. Doc. 36 ¶ 51; Doc. 45 ¶ 51. The risk level is used both while the inmate is still in custody for institutional management purposes as well as determining discharge procedures. Doc. 36 ¶ 51; Doc. 45 ¶ 51. All inmates are assigned a System Risk Level. Doc. 36 ¶ 51. East's System Risk Level was changed on September 22, 2021, to a Level 3. Id. ¶ 52; Doc. 45 ¶ 52. Dusti Werner, who was the SDDOC Risk Manager, made the change. Doc. 36 ¶ 52; Doc. 45 ¶ 52. Fluke, Neill, and Gilchrist were not involved in assigning East a System Risk Level on September 22, 2021. Doc. 36 ¶ 53. East contends that Fluke directed Neill and Gilchrist to give East a certain MnSOST score because they were aware that his MnSOST score would affect his System Risk Level, which, in turn, would affect his ability to earn earned discharge credits (EDCs). Doc. 45 ¶ 53. In November 2021, Debra Eilers, a Case Manager at MDSP, sent an email to Gilchrist asking about East's System Risk Level change on September 22, 2021. Doc. 36 ¶ 56; Doc. 45 ¶ 56. Gilchrist responded to Eilers's inquiry:

> SOMP does not have anything to do with his System Risk Level that is a DOC score. As for his MnSost Level R that was completed by SOMP staff in SF and based on his offense and number of victims and not something he would have been involved with. He was a Mnsost of 13 so once he completes SOMP and CBISA that might come down from a Level R but will still be a Level # 3 High Risk. Since his initial is not until 2028 SOMP does not start working with him until 2026, there

is no reason why I would need to speak with him until we start programming with him, but if I am still here in 2026 I will call him over. In the meantime you can invite him to kite me and I will provide a written response to his questions.

Doc. 29-17; Doc. 36 ¶ 56; Doc. 45 ¶ 56.

A System Risk Level can be changed for any number or combination of reasons. Doc. 5. On April 13, 2023, East was notified that he was classified as a low medium. Doc. 36 ¶ 65; Doc. 45 ¶ 65. On November 2, 2023, East was notified that his classification was medium, but if he successfully completes the institutional sex offender program when eligible, his score may be lowered. Doc. 36 ¶ 66; Doc. 45 ¶ 66. East confirmed that he understood this. Doc. 36 ¶ 66; Doc. 45 ¶ 66.

### C.    Housing Assignments

SDDOC Policy 1.4.B.3 provides for the use of the Adult Internal Management System (AIMS), a correctional management tool to manage inmates "to reduce violence, victimization and other misconduct." Doc. 36 ¶ 76 (quoting Doc. 29-7 at 1); Doc. 45 ¶ 76. AIMS identifies inmates with similar backgrounds, personalities, and behavior patterns to promote safe housing. Doc. 36 ¶ 76; Doc. 45 ¶ 76. Under the Prison Rape Elimination Act (PREA), all inmates are assessed for their potential to either be sexually victimized in prison or victimize others. Doc. 36 ¶ 77; Doc. 45 ¶ 77. Each inmate is assigned a "PREA score" to assist in determining safe housing. Doc. 36 ¶ 77; Doc. 45 ¶ 77. According to East, his AIMS score classifies him a low behavioral risk, and his PREA score indicates a potential to be sexually victimized. Doc. 45 ¶¶ 76, 77.

When an inmate wants to move to a different bunk location at MDSP, the inmate may submit a move slip request. Doc. 34 ¶ 10. Move slips must be approved by a Unit Manager or a Unit Coordinator. Doc. 36 ¶ 75; Doc. 45 ¶ 75. Before approving move slips, prison staff must consider AIMS and PREA scores, as well as other factors such as gang affiliation, medical

treatments, and bed availability. Doc. 34 ¶ 13; Doc. 36 ¶ 78; Doc. 45 ¶ 78. Even if all affected inmates agree to a particular move and are compatible by PREA and AIMS scores, the move cannot always be authorized. Doc. 36 ¶ 79; Doc. 45 ¶ 79.

The Barracks at MDSP consists of two large rooms and one smaller room. Doc. 34 ¶ 3. B1 and B2 are permanent inmate housing, and B3 is the intake area for inmates new to MDSP.[4] Id. New arrivals at MDSP go through an intake process to orient them to MDSP and to permit prison staff to identify appropriate housing. Id. The length of time inmates stay in the B3 intake area depends on availability of beds in long-term housing. Id. There are no physical barriers to impede movement of inmates between areas in the Barracks. Doc. 36 ¶ 84; Doc. 45 ¶ 84. Inmates are allowed to move between the section of the living quarters if authorized by staff, such as being called to a particular office, traveling for work, food service, or another approved activity. Doc. 36 ¶ 86; Doc. 45 ¶ 86. When Sestak was the Unit Manager for the Barracks unit, he was responsible for approximately 325–350 inmates. Doc. 36 ¶ 101; Doc. 45 ¶ 101.

### D.    Earned Discharge Credits (EDCs)

SDDOC Policy 1.4.B.17 governs EDCs. Doc. 36 ¶ 67; Doc. 45 ¶ 67. Inmates can earn EDCs several ways, including working within a facility. Doc. 36 ¶ 67; Doc. 45 ¶ 67. SDDOC Policy 1.4.B.17 provides that "[n]othing in this policy may be the basis for establishing a constitutionally protected liberty interest, property, or due process interest in any offender." Doc. 36 ¶ 68 (alteration in original) (quoting Doc. 29-4 at 5). Between December 2018 and June 2019, and again between July 2020 through January 2021, East received EDCs for work. Doc. 36 ¶ 69;

---

[4] East refers to B3 as the "A&O" unit because that is where inmates are initially housed when they arrive at MDSP, but the Admissions and Orientation Unit is in Sioux Falls, and is where all inmates are initially placed when they enter into the custody of the SDDOC to undergo various assessments to assign an appropriate long-term housing location. Doc. 31 ¶ 3.

Doc. 45 ¶ 69.  South Dakota law restricts the amount of EDCs available to inmates.  SDCL § 24-15A-50.1.

Eligible inmates may receive for work a maximum of 180 days of EDCs in a rolling-twelve month period.  Doc. 36 ¶ 70; Doc. 45 ¶ 70.  Between February 2021 and April 2021, East did not accumulate any additional EDCs for work because he had reached the maximum amount allowed.  Doc. 36 ¶ 71; Doc. 45 ¶ 71.  SDDOC Policy 1.4.B.17(IV)(2)(A)(6) provides that inmates who are classified as Level 3 System Risk during the review month are not eligible for EDCs for work or heroic acts.  Doc. 29-4 at 2; Doc. 36 ¶ 72; Doc. 45 ¶ 72.

### III.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial.  Gacek, 666 F.3d at 1145.  In ruling on a motion for summary judgment, the facts and inferences fairly

drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## IV.    Analysis

### A.    Section 1983

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  State employees like Defendants may be sued under § 1983 in their individual capacities, their official capacities, or both.  Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).  Here, East is suing Defendants in both their individual and official capacities for injunctive relief.  Doc. 5 at 30–31; Doc. 9 at 23.

The doctrine of qualified immunity is a defense available to state officials sued in their individual capacities under § 1983.  This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014).  Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  Id.  A plaintiff must meet both steps to defeat qualified immunity, and courts can begin (and perhaps end) with either step.  Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015).  Defendants argue that they are entitled to summary judgment on East's individual capacity claims because their alleged inactions or actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Doc. 29 at 3–5.

11

**B.     Failure to Exhaust**

Defendants contend that East's institutional file demonstrates that he has failed to exhaust available administrative remedies regarding all claims that survived screening.  Doc. 29 at 8. District courts must decide whether a prisoner exhausted his administrative remedies before addressing the merits of the prisoner's claims.  Benjamin v. Ward Cnty., 632 F. App'x 301, 301 (8th Cir. 2016) (per curiam).

The Prison Litigation Reform Act (PLRA) provides that an inmate must exhaust all available administrative remedies before bringing an action with respect to prison conditions under either § 1983 or any other federal law.  42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 (2001).  This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Jones v. Bock, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court." (citation omitted)).  The PLRA requires "immediate dismissal" of all unexhausted claims.  Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005).  To properly exhaust administrative remedies, East must comply with SDDOC's procedures.  Woodford v. Ngo, 548 U.S. 81, 102 (2006) ("[P]roper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures.).  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Bock, 549 U.S. at 218.  "An inmate satisfies § 1997e(a) by pursuing the prison grievance process to its final stage to an adverse decision on the merits."  Porter v. Sturm, 781 F.3d 448, 451 (8th Cir. 2015) (internal quotation omitted); see also Barnes v. Ark.

Dep't of Corr., 485 F. App'x 151, 152 (8th Cir. 2012) (per curiam) (affirming dismissal for failure to exhaust administrative remedies when prisoner grievance appeal was denied as untimely and not decided on the merits).

SDDOC Policy 1.3.D.07, which is titled, Grievance Procedure, is the current administrative remedy policy. Doc. 29-2; Doc. 36 ¶ 11; Doc. 45 ¶ 11. The effective date of the Grievance Procedure Policy is October 1, 2023. Doc. 29-2 at 1. The Grievance Procedure Policy replaced the Administrative Remedy for Inmates Policy 1.3.E.2. Doc. 29-8; Doc. 29-9; Doc. 29-10; Doc. 36 ¶ 12; Doc. 45 ¶ 12. SDDOC's grievance procedure has two or three steps, depending on the nature of the grievance. Doc. 36 ¶ 11. An inmate must first try to resolve his complaint informally, either by resolving the matter verbally with staff or by submitting a Request for Informal Resolution form. Doc. 36 ¶ 13; Doc. 45 ¶ 13; Doc. 29-9 at 6. If an inmate is not satisfied with staff's response to an informal request, the inmate must proceed to the second step, which requires him to file a Request for Administrative Remedy. Doc. 29-2 at 6–7; Doc. 36 ¶ 11; Doc. 45 ¶ 11. A third step allows inmates to appeal to the Secretary of Corrections certain issues, including "a classification status action that affects the offender personally[.]" Doc. 36 ¶ 11 (quoting Doc. 29-2 at 7); Doc. 45 ¶ 11.

According to Defendants, "[a] review of all grievances filed by East from September 15, 2016, through September 9, 2023 (the day this case was initiated), shows there were unexhausted grievances on all issues." Doc. 29 at 11 (citing Doc. 29-11 (Offender Issues Report)). On the basis of the grievances in the record that Defendants discuss, Defendants have demonstrated that East has failed to fully and properly exhaust his administrative remedies regarding his claim for retaliation, his claim that Sestak disregarded his concerns about unsafe bunkmates, and his claim that the grievance policy is unconstitutional. See Docs. 29-25, 29-26, 29-27, 29-31, 29-32.

But the record demonstrates that East has filed other grievances that Defendants do not discuss. See Doc. 29-11. Based on this Court's review of the Offender Issues Report, whether there are unexhausted grievances on all issues remains a question of fact at this point. The Offender Issues Report summarizes the response to issues East has raised, but it does not include, even in summary form, a description of the specific issue East was grieving. See Porter, 781 F.3d at 451 (stating that failure to exhaust is an affirmative defense that "defendants have the burden of raising and proving"). Defendants do not provide any evidence about whether the grievances they do not discuss, and which may have been properly exhausted, relate to any of the claims in this lawsuit. Perhaps Defendants have discussed all the grievances related to the claims in this lawsuit, but this Court must construe the facts in the light most favorable to East when ruling on Defendants' motion for summary judgment. Accordingly, there are issues of material facts whether East failed to exhaust available remedies. Defendants are not entitled to summary judgment on this ground given the state of the record.

### C.    Retaliation

East alleges that Fluke, Neill, and Gilchrist "took the adverse action of giving [him] an MnSOST score that would result in East receiving a system risk level that would prevent him from earning EDCs" in retaliation for filing a lawsuit alleging sexual abuse at MDSP. Doc. 46 at 34. "[T]he First Amendment 'prohibits government officials from subjecting individuals to "retaliatory actions" after the fact for having engaged in protected speech.'" Aldridge v. City of St. Louis, 75 F.4th 895, 898 (8th Cir. 2023) (quoting Houston Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 474 (2022)). To state a First Amendment retaliation claim, East must first show that he engaged in protected First Amendment activity. Id. Next, East must show that Defendants "took [an] adverse action . . . that would chill a person of ordinary firmness from continuing in the

[protected] activity." Id. at 899 (alterations in original) (quoting Molina v. City of St. Louis, 59 F.4th 334, 338 (8th Cir. 2023)). Finally, East must prove Defendants "would not have taken the adverse action but for harboring 'retaliatory animus' against [him] because of his exercise of his First Amendment rights." Mitchell v. Kirchmeier, 28 F.4th 888, 896 (8th Cir. 2022) (citing Nieves v. Bartlett, 587 U.S. 391, 399 (2019)).

East must establish a causal connection between the Defendants' alleged retaliatory animus and his subsequent injury. Aldridge, 75 F.4th at 899. "Generally, more than a temporal connection is required to present a genuine factual issue on retaliation." Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 986 (8th Cir. 2011) (internal quotation omitted). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." Nieves, 587 U.S. at 398. When there is an "obvious alternative explanation" for the officers' allegedly retaliatory conduct, the but-for causation requirement is not satisfied. Aldridge, 75 F.4th at 899–90. In other words, East must demonstrate that he was singled out[5] due to protected First Amendment activity. Id. at 899 (citation omitted). "If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" Id. (quoting Mitchell, 28 F.4th at 896).

Defendants are entitled to summary judgment on East's retaliation claim because East has not satisfied the causation requirement as a matter of law. East has produced no evidence that the delayed calculation of his MnSOST score would not have occurred but for his previous lawsuit. Nieves, 587 U.S. at 399 ("[I]t must be a 'but-for' cause, meaning that the adverse action against

---

[5] East contends that there are many inmates who have blank MnSOST scores and that another inmate who filed a lawsuit also had his MnSOST score changed from blank to R. Doc. 47 ¶¶ 9, 10. Because these paragraphs in East's affidavit do not comply with Rule 56(c)(4), this Court disregards them.

the plaintiff would not have been taken absent the retaliatory motive" (citation omitted)). The record shows that the delayed calculation of an MnSOST score for East involved no retaliatory animus and was not a "but for" cause of the change in his MnSOST score.

According to East's amended complaint, he "informed Gilchrist in January 2021 he did not have scores for the MnSOST and STATIC-99." Doc. 10 ¶ 231. When Gilchrist became aware that East had not received an MnSOST score on admission, he notified Neill, and Neill conducted the delayed assessment that should have been performed on admission. Doc. 33 ¶¶ 6, 11; Doc. 36 ¶¶ 37, 38; Doc. 45 ¶¶ 37, 38. There is no evidence that East's MnSOST that was entered in 2021 is different than the score would have been if it had been entered in 2014. Doc. 33 ¶ 12. Similarly, there is no evidence that Gilchrist and Neill would not have taken steps to correct the apparent oversight when East brought it to their attention, notwithstanding East's prior lawsuit. Finally, East argues that his MnSOST score was improperly calculated, but these arguments are based on East's comparison of his MnSOST to what other inmates have told him their scores are. What other inmates have told East about their scores is not admissible evidence and does not create a genuine issue of fact.

East's MnSOST score was entered on January 20, 2021. Id. ¶ 11. Approximately nine months later, in September 2021, East's System Risk Level was raised. Doc. 36 ¶ 52; Doc. 45 ¶ 52. According to East, "[a]fter the lawsuit filed by East containing the sexual abuse complaint was finalized, Fluke and John Doe 1 contacted Neil [sic] asking him to punish East for making such a complaint with an MnSOST score of an R." Doc. 10 ¶ 242.[6] East estimates that his lawsuit

---

[6] This paragraph does not comply with Rule 56(c)(4), but this Court considers it only because East avers that "Fluke told me that he and another person had contacted Neill to give [him] an MnSOST score that would eventually result in loss of EDCs." Doc. 47 ¶ 13. Whether Fluke provided instruction to Neill regarding East's MnSOST score is disputed but it is not a material issue of fact. See Erickson v. Nationstar Mortg., LLC, 31 F.4th 1044, 1048 (8th Cir. 2022) (recognizing that a

concluded around August 8, 2021, when the 90 days expired for East to petition the Supreme Court of the United States. Id. ¶ 211; see also Doc. 29-25 at 6 ("Allegedly my MnSOST score was changed from a Blank to an R, sometime in September of 2021. I believe this is being done explicitly in retaliation for the lawsuit that became final in August of 2021.").

East's System Risk Level, which was changed in September 2021, is what impacted East's his ability to earn EDCs. None of the named Defendants are involved in assigning an inmate a System Risk Level. Doc. 36 ¶ 53; Doc. 30 ¶¶ 21–22; Doc. 31 ¶¶ 14–15; Doc. 35 ¶¶ 4, 6. Dusti Werner, the SD DOC Risk Reduction Manager, is who changed East's System Risk Level on September 22, 2021. Doc. 36 ¶ 52; Doc. 45 ¶ 52. East speculates that "Fluke, Neill, and Gilchrist were involved in giving [him] an MnSOST score of an R that they knew would affect [his] System Risk Level and lead to the loss of EDCs." Doc. 45 ¶ 53. There is no evidence that East's System Risk Level was changed in September 2021 solely because of his January 2021 MnSOST score. Because a System Risk Level can be changed for any or a combination of reasons, East cannot show his would not have been changed but for the change in his MnSOST score. See Doc. 29-5. Because East has not demonstrated that the loss of EDCs, which he attributes solely to his January 2021 MnSOST score, would not have occurred but for the previous lawsuit, Defendants are entitled to summary judgment on East's retaliation claim.

Wasko did not become the Secretary of Corrections until March 2022, well after the alleged retaliatory actions. Doc. 35 ¶ 1. "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir.

---

fact is material if it may affect the outcome of the suit). Regardless of what Fluke may have told Neill, there is no evidence that Neill and/or Gilchrist would not have conducted the overlooked assessment in January 2021 when East, by his own admission, brought it to their attention, or that the score was any different than it would have been if the assessment had been performed upon admission. That is, there is no "but-for" causation.

1990); see also Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (to be cognizable under § 1983, a claim must allege that the defendant was personally involved in or directly responsible for the incidents that deprived the plaintiff of his constitutional rights). It is undisputed that Wasko was not personally involved in or directly responsible for the alleged retaliatory conduct. Wasko is entitled to summary judgment on East's individual capacity First Amendment claim for retaliation for this reason as well.

### D.    Eighth Amendment Claims

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.'" Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). The Supreme Court has instructed that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation omitted). Basic human needs, according to the Supreme Court, include "food, clothing, shelter, medical care, and reasonable safety." Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal quotation omitted). "A prison official 'violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates.'" Vandevender v. Sass, 970 F.3d 972, 975 (8th Cir. 2020) (quoting Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998)).

To state a claim that Defendants failed to protect him from harm in violation of the Eighth Amendment, East must allege facts showing that (1) the conditions of his confinement create a substantial risk of serious harm, and (2) each Defendant was deliberately indifferent to that risk of harm. Williams, 49 F.3d at 445 (citing Farmer, 511 U.S. at 834, 837; Blevins v. Schnell, 2021 WL 5088164, at *2 (D. Minn. Sept. 15, 2021). The first prong is considered objectively, but the

second prong is subjective and requires East to demonstrate that each Defendant acted with a "sufficiently culpable state of mind." Blevins, 2021 WL 5088164, at *2 (quoting Farmer, 511 U.S. at 834). "To be liable, the 'official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Vandevender, 970 F.3d at 976–77 (quoting Farmer, 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." Kulkay v. Roy, 847 F.3d 637, 643 (8th Cir. 2017) (citation omitted).

### 1.    Alleged Deliberate Indifference to Risk of Sexual Assault

East's complaint contains three allegations of sexual assault. He claims that he was assaulted by Inmate A in 2014 and 2015. Doc. 1 ¶¶ 64, 93. He also claims that he was sexually abused by a physician's assistant on May 23, 2019. Id. ¶¶ 110, 125. East's complaint was filed on September 9, 2022. See generally id. East's Eighth Amendment failure to protect claims regarding these incidents were dismissed with prejudice on screening because they were not brought within the three-year statute of limitations. Doc. 5 at 23 (citing SDCL § 15-2-15.2). East did not allege any inequitable circumstances that prevented him from timely commencing this lawsuit.[7] Id. (citing Doc. 1 ¶¶ 61–140). East does not allege that he has been sexually abused or

---

[7] Notably, in a prior lawsuit, in response to defendants' motion for summary judgment, East alleged that he had been assaulted by a physician's assistant on May 23, 2019, during a rectal examination. East v. Dooley, 4:19-CV-04126, 2020 WL 5816248, at *26 (D.S.D. Sept. 30, 2020) ("In response to the motion for summary judgment, East submitted an affidavit claiming, for the first time, that PA Zimmer did not use any lubrication when she examined his rectum. And he claimed in his brief, again for the first time, that PA Zimmer 'painfully inserted her finger into' his anus and that he experienced 'fear, anxiety, worry, and extreme physical pain.'" (citations to the record omitted), aff'd, 847 F. App'x 359 (8th Cir. 2021). This Court did "not consider East's Eighth Amendment claim for sexual abuse because he did not plead it in his complaint." Id. After this Court refused to consider East's claim for sexual abuse against a physician's assistant because it was not plead in a complaint, East waited nearly two years to commence this action alleging claims arising from the May 23, 2019 incident. See generally Doc. 1.

19

sexually assaulted after that alleged May 23, 2019 incident. See generally Docs. 1, 10, 45, 46, 47.

Rather, he alleges that after May 23, 2019, Defendants were deliberately indifferent to his concerns

that he could be sexually assaulted and are liable for failure to protect because they did not address

his concerns. East's allegations, when considered in light of the record evidence, are insufficient

as a matter of law, to establish a failure to protect claim.

### a.    Objective Component

When an inmate does not suffer any injury due to an alleged failure to protect, he fails to

satisfy the objective component of a failure-to-protect claim. In Schoelch v. Mitchell, 625 F.3d

1041 (8th Cir. 2010), Schoelch, a pretrial detainee,[8] alleged that a jail guard had failed to protect

him from another pretrial detainee on two occasions. Id. at 1044–45. On October 27, the first

occasion, a pretrial detainee with a reputation for aggressiveness and misbehavior entered

Schoelch's cell, stated that he intended to "kill" him, and then grabbed Schoelch and slammed him

against the wall. Id. at 1044. Schoelch did not allege that he suffered any injury as a result of the

incident. Id. at 1046. The Eighth Circuit held that the incident did not satisfy the objective

component of a failure-to-protect claim. Id. at 1046–47. The Eighth Circuit reasoned:

> Because Schoelch presented no evidence that he suffered an objectively serious
> mental or physical injury from the conditions of his confinement on October 27, or
> that the conditions on that date (i.e., the failure to protect him from [the other
> pretrial detainee] on that date) are likely to cause serious injury in the future, he has
> not satisfied the objective component of his failure-to protect . . . claim.

Id. at 1047 (internal citation omitted).

Because East has not alleged any injury due to the Defendants' alleged failure to protect

after the last alleged sexual assault in 2019, the PLRA bars his claim for damages. The PLRA

---

[8] The Eighth Circuit analyzes pretrial detainee failure-to-protect claims under the Eighth
Amendment standard. Holden v. Hirner, 663 F.3d 336, 340–41 (8th Cir. 2011).

mandates that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18)." 42 U.S.C. § 1997e(e). The Eighth Circuit interprets § 1997e(e) "as limiting recovery for mental or emotional injury in all federal actions brought by prisoners." McAdoo v. Martin, 899 F.3d 521, 525 (8th Cir. 2018) (quoting Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004)). The Eighth Circuit consistently has upheld the dismissal of failure to protect claims in the absence of any allegation of physical injury.[9] See, e.g., Ellis v. Norris, 179 F.3d 1078, 1079 (8th Cir. 1999) (affirming dismissal of Eighth Amendment claim when plaintiff did not allege that inadequate security had caused him injury); Kellensworth v. Norris, 221 F.3d 1342 (8th Cir. 2000) (per curiam) (affirming dismissal of failure to protect claim when plaintiff made no allegation of physical injury resulting from being housed in a cell with an inmate he feared); see also Babcock v. White, 102 F.3d 267, 272 (7th Cir. 1996) (explaining that "it is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment").

### b.    Subjective Component

East alleges that Fluke failed to investigate the alleged 2019 assault by the physician's assistant. According to East, "Zimmer's conduct was presented to Fluke who willfully chose to take no measures to report or investigate the complaint." Doc. 46 at 8. East contends that he "presented" Zimmer's conduct to Fluke when he responded to defendants' motion for summary judgment in a previous lawsuit, but after the summary judgment responsive pleadings were filed,

---

[9] East cannot argue the time-barred sexual assault incidents constitute injury caused by Defendants' failure to protect him after the incidents. Permitting him to do so would impermissibly revive his time-barred claims.

Fluke did not investigate Zimmer's alleged sexual assault. Id. According to East, "the various filings in the lawsuit put Fluke on notice of the abuse." Id. East does not allege, and there is no evidence to support, that East reported the alleged May 23, 2019 assault by any of the means outlined in the SDDOC's Prison Rape Elimination Act (PREA) Policy 1100-01.[10]

East assumes, but provides no evidence, that Fluke, in fact, reviewed East's responsive summary judgment pleadings in East's prior federal case. At most, East has demonstrated that Fluke should have been on notice of his previous abuse allegation, but East must show that Fluke was in fact aware of East's previous allegation, and, based on his awareness of this previous allegation, inferred that a substantial risk of serious harm to East existed. Vandevender, 970 F.3d at 976–77. East's broad, conclusory allegations fall far short of presenting a genuine issue of material fact, let alone sustaining this burden. Moreover, Fluke is entitled to qualified immunity on East's failure to investigate claim because East has not identified, and this Court is not aware of, any authority clearly establishing that the Eighth Amendment mandates that a prison warden investigate allegations of sexual abuse presented only in responsive summary judgment pleadings. Peterson v. Heinen, 89 F.4th 628, 640–41 (8th Cir. 2023) ("For a right to be clearly established, the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." (cleaned up and internal quotation omitted)).

East alleges that Wasko is liable in her individual capacity for deliberate indifference to the risk of sexual assault because she failed to train Fluke and other staff. Doc. 10 ¶¶ 268–287. Wasko is entitled to summary judgment on this claim because it is undisputed that during the

---

[10] South Dakota Department of Corrections, Policies and Procedures: Policy Number 1100-01 at 14, https://www.doc.sd.gov/home/showpublisheddocument/1198/638726153988570000 (last visited Mar. 26, 2025).

relevant time period, Sestak, Fluke, Gilchrist, Neill, and Lengkeek completed annual PREA training. Doc. 36 ¶¶ 92, 93, Doc. 45 ¶¶ 92, 93. Wasko and Fluke have taken steps to insure all SDDOC employees undergo the required training outlined in SDDOC Policy 1.1.D.1 (Staff Training Requirements). Doc. 29-1; Doc. 36 ¶¶ 91, 94; Doc. 45 ¶¶ 91, 94.

East alleges that Wasko and Fluke discourage inmates and staff from reporting sexual assault, sexual harassment, or similar conduct.[11] Doc. 46 at 47–55. To support these allegations, East asserts that an inmate tried to call the Rape Crisis Center to report sexual abuse, but the call was intercepted by MDSP, and the inmate was sent to a higher risk prison for making the report. Doc. 47 ¶ 29. This is another averment that lacks foundation and fails to comply with Rule 56(c)(4).

East then asserts that Wasko "had all the [phone] dividers removed in order to deter inmates from reporting sexual abuse." Doc. 47 ¶ 30. East's speculation regarding why phone dividers were removed does not raise a genuine issue of material fact whether Wasko was deliberately indifferent to the serious risk of harm to East from sexual assault. Because the number of phone calls an inmate can make is limited to five per day and there are not exceptions, East argues that inmates are restricted from reporting sexual abuse. Doc. 47 ¶ 44. A restriction on the number of daily phone calls, as a matter of law, does not constitute deliberate indifference to the risk of sexual assault or abuse, especially when there are other means to report sexual abuse or assault. See South Dakota Department of Corrections, Policies and Procedures: Policy Number 1100-01 at 14, https://www.doc.sd.gov/home/showpublisheddocument/1198/638726153988570000 (last visited

---

[11] East argues that Defendants Fluke and Wasko violated various provisions of the PREA. See, e.g., Doc. 46 at 49–51. As this Court stated when dismissing these claims on screening, the PREA "does not create a private right of action enforceable by an individual civil litigant." Doc. 5 at 11 (internal citation and quotation omitted).

Mar. 26, 2025). Signs are posted at MDSP instructing inmates how to report sexual assault or sexual abuse, and inmates receive instruction how to make such reports when they arrive at MDSP.[12] Doc. 29 at 37. East has not proffered any evidence to establish a genuine issue of material fact that Wasko or Fluke were aware that there was a substantial risk of harm to East from sexual assault and were deliberately indifferent to that risk.

East alleges that "[t]he culture established by Wasko within South Dakota's Prison System is such that rape is viewed as part of doing time, so personnel are often indifferent to preventing prison rape and sexual harassment." Doc. 47 ¶ 34. Wasko did not become the Secretary of Corrections until March 2022. Doc. 35 ¶ 1. Thus, the "culture" she allegedly established, as a matter of law, is not responsible for East's alleged sexual assaults, which are time-barred as occurring in 2014, 2015, and 2019, and not at issue in this lawsuit.

East contends that he "does not have to wait to be raped again[]" and relies on Farmer. Doc. 46 at 53. In Farmer, the Supreme Court explained that "a subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief.'" 511 U.S. at 845 (alterations in original) (quoting Helling, 509 U.S. at 33–34)). But East wants this Court to find that mere risk of sexual assault or abuse is sufficient to establish a compensable Eighth Amendment failure to protect claim. Farmer mandates that East demonstrate that Wasko and Fluke know of and disregarded "an *excessive* risk to inmate health or safety; . . . [they] must both be aware of facts from which the inference could be drawn that a *substantial* risk of serious harm exists, and [they] must also draw the inference." Id. at 837 (emphasis added). East has not submitted any evidence

---

[12] On January 3, 2022, East submitted a grievance reporting that a PREA sign on a bulletin board was covered up. Doc. 29-23. The obstruction was removed in response to this grievance. Doc. 10 ¶ 280.

that would be admissible at trial that Fluke or Wasko are aware of and have deliberately disregarded an excessive or substantial risk of sexual assault.

### 2.     Unsafe Housing Conditions

East contends that Sestak wanted to move a dangerous inmate, who had been known for fighting other inmates, into his bunk.[13]  Doc. 47 ¶ 20.  East does not allege or provide any evidence that this allegedly dangerous inmate was actually moved into his bunk, but even if he had, "[a]n inmate's history of violence alone is insufficient to impute to prison officials subjective knowledge of the inmate's danger to harm other inmates."  Holden v. Hirner, 663 F.3d 336, 341 (8th Cir. 2011).  Sestak denies that he was aware of any specific danger to East, including any danger from his bunkmates, Doc. 36 ¶ 81, and there is nothing in the record to indicate that Sestak was aware that East's bunkmates posed a substantial risk and deliberately disregarded such risk.

East argues that Sestak permitted inmates from unit B3 to travel to B1 and B2 without permission and failed to sanction inmates for being in unauthorized areas.  Doc. 46 at 59–61.  He also alleges that Fluke and Wasko were deliberately indifferent because they failed to move the "A&O" unit from B3, where East was housed, to Ludeman, a separate building.  Id. at 62.  These allegations are premised on East's conclusory allegation, unsupported by any competent evidence, that inmates in B3 are some of the most dangerous inmates because it is the "A&O" unit.  Doc. 47 ¶ 21.  According to Fluke, housing incoming inmates to MDSP in the B3 unit does not present an increased risk to inmates housed in B1 or B2.  Doc. 30 ¶ 42.  East alleges that he had one incident with B3 inmates before the lawsuit was filed and that there were "two more incidents with B3

---

[13] In his responsive brief, East alleges, for the first time, that "Sestak told [him] to stop making complaints or he would be moved to a more dangerous unit (East Crawford)."  Doc. 46 at 57.  East's First Amendment retaliation claim for his housing arrangement did not survive screening.  Doc. 5 at 16.  East cannot allege additional facts, for the first time, in response to a motion for summary judgment, to revive a claim that was dismissed on screening.

[inmates] targeting [him]." Doc. 47 ¶¶ 67–68. East provides no dates, times, names, or additional information regarding these alleged incidents, and he does not allege that he reported these incidents to Sestak, Fluke, Wasko, or any other prison official.

East alleges that "Special Security" informed him that they had recommended to Wasko and Fluke that the orientation unit be moved from B3 to Ludeman, but Wasko and Fluke denied the request "because they preferred to put the most vulnerable inmates . . . at the most risk." Id. ¶ 21. East does not identify which individual in Special Security shared the recommendation with him or when this allegedly occurred. As such, Rule 56(c)(4) does not permit this Court to consider this allegation because it does not set forth facts that would be admissible in evidence. Similarly, East's speculation as to any motive or reason Fluke or Wasko may have had regarding where to house inmates does not comply with Rule 56(c)(4). East has not provided any evidence that Sestak, Fluke, and Wasko were aware of and deliberately indifferent to an excessive risk of harm because incoming inmates to MDSP are housed in a unit that does not have physical barriers impeding the movement of inmates between the areas.[14]

---

[14] East also filed a surreply alleging a violent outbreak between prisoners occurred at MDSP in July 2024. Doc. 57. Neither the Local Rules nor the Federal Rules of Civil Procedure allow litigants to file a surreply as a matter of right. Counts v. Wasko, 4:23-CV-4103, 2024 WL 4068651, at *3 (D.S.D. Sept. 5, 2024); Emps. Mut. Cas. Co. v. Brant Lake Sanitary Dist., 4:18-CV-4029, 2019 WL 102253, at *2 (D.S.D. Jan. 4, 2019). Instead, a party may seek permission to file a surreply when the opposing party's reply brief raises new facts or argument that necessitate a response. Counts, 2024 WL 4068651, at *3. This Court will not consider the allegations in East's surreply as he never sought permission to file the surreply and the Defendants' reply brief did not raise new issues requiring a response. Moreover, the allegations in East's surreply would not create a genuine issue of material fact even if East had moved for permission to file his surreply. A good portion of East's allegations about the disturbance in July 2024 are based on things unidentified individuals supposedly told East. These statements are inadmissible hearsay and cannot be used to defeat summary judgment. See Jenkins v. Winter, 540 F.3d 742, 748 (8th Cir. 2008) ("When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." (citation omitted)).

### 3.    Injunctive Relief

East requests injunctive relief in several forms, including making "prevention of sexual abuse a top priority" and moving "A&O at MDSP" to the Ludeman building. Doc. 10 at 60. East bears the burden of establishing that he has standing under Article III of the Constitution to request injunctive relief. Park v. Forest Serv. of U.S., 205 F.3d 1034, 1036–37 (8th Cir. 2000). To demonstrate standing, East must establish an injury in fact; a causal connection between the injury and the alleged conduct of the Defendants; and a likelihood that the remedy he seeks will redress the alleged injury. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–03 (1998). When a plaintiff seeks injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." Park, 205 F.3d at 1037. Evidence that a plaintiff suffered an injury in the past does not alone establish that the plaintiff has standing to seek injunctive relief. See O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects"). A plaintiff's speculation that he may suffer injury in the future is likewise insufficient. City of L.A. v. Lyons, 461 U.S. 95, 102 (1983) (explaining that a "conjectural" or "hypothetical" threat of injury does not establish standing). Instead, as the Supreme Court made clear in Lyons, the plaintiff must show that "the injury or threat of injury" is "'real and immediate'" to have standing to seek injunctive relief. Id.

In Lyons, the plaintiff sought injunctive relief barring police officers from the City of Los Angeles from using chokeholds unless suspects were threatening the officers with the immediate use of deadly force. Id. at 98. The Supreme Court held that the plaintiff did not have standing to seek such relief because he had failed to demonstrate that there was a sufficient likelihood that the

27

police would subject him to a chokehold in the future. Id. at 105–110. Although the plaintiff had been subjected to a chokehold in the past and alleged that the police officers routinely applied chokeholds when they were not threatened by deadly force, the Supreme Court concluded that these facts fell short of establishing that the plaintiff faced a real and immediate threat of future harm. Id. 105–106.

Like the plaintiff in Lyons, East has failed to demonstrate that there is a real and immediate threat that he will be sexually assaulted or attacked. Instead, he relies on conclusory statements, inadmissible evidence, and allegations from several years ago that are barred by the statute of limitations. This is not sufficient to create a genuine issue of material fact on this record to avoid summary judgment.

### E.    Fourteenth Amendment Equal Protection

East alleges that he is being singled out for selective treatment for filing lawsuits, grievances, and reporting sexual abuse. Doc. 10 ¶¶ 364, 414–420. The Equal Protection Clause of the Fourteenth Amendment requires the government to "treat similarly situated people alike[.]" Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 984 (8th Cir. 2004) (quoting Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)). To show an equal protection violation, East "must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest." Id. (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). Although East does not allege differential treatment based on a suspect classification, his equal protection claim survived screening because he alleged that he is being treated differently because he has exercised his First Amendment rights. See Doc. 1 ¶ 389. At the summary judgment stage, East must produce some evidence to substantiate this allegation and create a genuine issue

of material fact. Because he has not done so, Defendants are entitled to summary judgment on his equal protection claim.

East argues he "has shown he has and continues to be treated differently than other inmates because he exercised his First Amendment right." Doc. 46 at 68. However, East fails to cite to any record evidence or otherwise explain how he has shown that he is treated differently than other inmates because he exercised his First Amendment rights. For the first time, in his responsive brief, East asserts that he "suffered a change in his housing status by Wasko, as he was removed from the Barracks and placed into Harmon as a result of filing this lawsuit." Id. If East contends that he has been subjected to retaliation for filing this lawsuit, it was incumbent upon him to file a motion for leave to file a supplemental complaint raising this claim. He did not do so, and this claim is not properly before this Court.

### F.   Fourteenth Amendment Due Process Claim

East contends that the SDDOC policy (1.3.E.2) providing that inmates have thirty (30) days to initiate the administrative remedy process following a classification or status decision violates due process because SDDOC policy does not require staff members to notify an inmate of a classification change or status decision. Doc. 10 ¶¶ 287–291. Because the change disqualified East from accumulating EDCs, he claims the change amounts to a constitutional violation. Id. ¶ 291.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Smith v. McKinney, 954 F.3d 1075, 1079 (8th Cir. 2020) (quoting Wilkinson v. Austin, 545 U.S. 209, 221 (2005)). "Once a liberty interest is established, the next question is what process is due." Id. (quoting Williams v. Norris, 277 F. App'x 647, 649

(8th Cir. 2008) (per curiam)). This question need only be answered if the inmate can establish a constitutionally protected liberty interest. Id. (citing Wilkinson, 545 U.S. at 221).

Here, East alleges he was denied the opportunity to earn EDCs, so this Court must first consider whether East has a liberty interest in earning EDCs. SDCL § 24-15A-50.1 provides in part:

> The department *may* grant an inmate up to ninety days of earned discharge credits for each program completion; up to ninety days of earned discharge credits upon completion of three hundred sixty hours of satisfactory work not to exceed one hundred eighty days of earned discharge credit for work in a twelve-month period; and up to three hundred sixty-five days of earned discharge credits for heroic acts in life threatening situations, through significant efforts in disaster response or by providing exceptional assistance in maintaining the safety and security of a prison. . . . Earned discharge credits under this section *may* be granted if in the judgment of the warden and the secretary of corrections, the inmate has met the criteria set forth in this section. *Nothing in this section may be the basis for establishing a constitutionally protected liberty, property, or due process interest in any inmate.*

SDCL § 24-15A-50.1 (emphasis added). Based on the plain language of the statute, East does not have any constitutionally protected liberty interest in earning EDCs. See also Scott v. Haynes, 4:23-CV-04115-RAL, 2024 WL 2045748, at *4 (D.S.D. May 8, 2024) ("Many courts have held that the loss of a mere opportunity to accumulate credit towards a sentence is not sufficient to create a protected liberty interest." (cleaned up and quotation and emphasis omitted)); Doc. 29-4 at 5 ("Nothing in this policy [SDDOC Offender Earned Discharge Policy] may be the basis for establishing a constitutionally protected liberty, property, or due process interest in any offender.").

Even assuming that East has an expectation or interest in earning EDCs, SDDOC's grievance policy requiring that the administrative remedy policy process be initiated within thirty days following a classification or status decision is not unconstitutional because there may not be a specific requirement that a staff member notify an inmate of a classification change or status

decision. The grievance policy provides that "[f]ixed time limits, as set forth within this policy, will be followed by staff and offenders, unless staff determines reasonable cause exists to support an extension of the deadline." Doc. 29-2 at 2. Thus, if an inmate becomes aware of a classification or status decision more than thirty days after the decision is made, the inmate may still challenge the decision if there was reasonable cause for the inmate's lack of awareness.

In his responsive brief, East "not[es] that Defendants [sic] argument is solely based on EDCs. If this case were just about EDCs Defendants may have an argument here, however, this case was not just about EDCs." Doc. 46 at 70. Based on East's complaint and amended complaint, this part of his case is just about EDCs. Neither his complaint nor his amended complaint alleges that a change in his MnSOST score or classification status could potentially affect his eligibility for parole. See generally Docs. 1, 10; see also Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) (stating that a plaintiff cannot rely at the summary judgment stage on a claim that was not raised in his complaint).

Finally, East requests that he be granted "five EDC's that he otherwise would have had the opportunity to earn had he not been retaliated against." Doc. 10 at 61. Section 1983 claims for injunctive relief seeking the award of EDCs are barred under Preiser v. Rodriguez, 411 U.S. 475, 500 (1973), and Minter v. Bartruff, 939 F.3d 925, 928 (8th Cir. 2019), because the sole federal remedy for such matters is a writ of habeas corpus. Scott v. Carpenter, 4:23-CV-4020, 2023 WL 4249200, at *11 (D.S.D. June 29, 2023) (citing Thares v. Wallinga, 4:21-CV-4107, 2023 WL 3389030, at *8 (D.S.D. May 11, 2023)). For all of these reasons, Defendants are entitled to summary judgment on East's Fourteenth Amendment Due Process Claim.

## V.    Conclusion

For these reasons stated above, it is

ORDERED that Defendants' motion for summary judgment, Doc. 28, is granted. It is further

ORDERED that East's request for subpoenas and preservation of evidence, Doc. 60, is denied as moot.

DATED March 31st, 2025.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE

32